UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DANIEL ANTUAN JENKINS,

                Petitioner,

                                      Civil Action No. 10-cv-10339
v.                               HON. BERNARD A. FRIEDMAN

DEBRA L. SCUTT,

                Respondent.

_____/


## OPINION AND ORDER
## DENYING THE PETITION FOR WRIT OF HABEAS CORPUS,
## DENYING A CERTIFICATE OF APPEALABILITY AND
## GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

        Petitioner Daniel Antuan Jenkins filed an application for the writ of habeas corpus,

challenging his Oakland County conviction and sentence for armed robbery.  The habeas petition

raises issues regarding the weight and sufficiency of the evidence, the admission of certain evidence,

the assistance provided by trial and appellate counsel, the sentence and the racial composition of

Oakland County juries.  The state courts' rejection of these claims was objectively reasonable.

Consequently, the petition must be denied.

**I.  Background**

        Petitioner was charged in Oakland County, Michigan with the armed robbery of a

hotel on May 18, 2003.  The state court summarized the facts adduced at trial as follows:

>     . . . Llanard Hanley's testimony established that he was
> working as the desk clerk at the Auburn Hills Fairfield Inn on May
> 18, 2003.  Shortly after 5:00 a.m., three men in masks, dark hooded
> jackets and carrying handguns came in.  They walked over to him and
> said "let's go."  One of the men was wearing light gray sweatpants,
> another was wearing dark colored sweatpants, and the third was

wearing black pants with white stripes down the sides of the legs. He observed that one was wearing green plaid boxer shorts. Mr. Hanley's hands were tied behind his back using a green jump rope and the three masked men walked him to the back room. When they arrived at the back room they asked him for the keys to the cash drawer. The masked men were unable to unlock the drawer so they busted the lock and took the money inside. They also took the money in a cash box located alongside the cash drawer. Then the masked men asked Hanley where the safe was located and its combination. Hanley told them the safe was in the manager's office, but that he did not have the combination. When he could not produce the safe combination, the masked men took him into the break room and asked Hanley if he was "ready to die." They had him lie face down with his head towards the door. As the men left, Hanley heard one of them say "hey, Corn, let's go."

Officer Jeffrey Walker's testimony established that he was a police officer with the City of Auburn Hills. Walker was working as a patrol officer on May 18, 2003, when he was dispatched to the Auburn Hills Fairfield Inn on the report of an armed robbery. After he arrived at the Fairfield Inn, he and Sergeant Amand located Mr. Hanley in the break room and Amand cut off the rope that was around Hanley's wrists. After interviewing Hanley, Walker gathered the security camera tape and returned to the police station. On the tape, Walker observed that one of the subjects had a black hooded jacket with a sunburst on the back and the letter M outlined in thread.

On May 21, 2003 Walker was again on patrol duty when he was dispatched to the Extended Stay Hotel for trouble in one of the rooms. Walker arrived at the hotel and made contact with Kendra Lewis in the hallway. Lewis pointed down the hall where Walker observed someone going down the stairs. The officer learned that Lewis was staying at the hotel with Defendant. The officer also learned that Defendant was known to carry a firearm. Concerned, he obtained permission to search Lewis' vehicle. Upon searching the vehicle, Walker became suspicious when he found several articles that matched the description of clothing that was worn by the suspects in the Fairfield Inn robbery. Walker found a black sweatshirt and a hooded sweatshirt with the sunburst design. He found rope that was similar to the kind used in the robbery, gloves and sweat pants and boxes of ammunition for a nine-millimeter weapon as well as a .38-caliber weapon. Walker also found rolled coins in front of the ammunition boxes.

Kendra Lewis' testimony established that she was Defendant's girlfriend at the time of the robbery. She established that Defendant was called AC or Acorn because of his head. Lewis, Defendant and her children, were staying at the Extended Stay Hotel next door to the Fairfield Inn. On the 21st, the two had a fight and the police were summoned. Lewis owned a 1995 Winstar van that both she and Defendant drove. They had recently moved from the Wood Lake Hills apartments and still had some of their stuff in the van. Police asked if they could search the van and she gave them permission. Police showed her a sweater, gloves, green plaid boxer shorts and jogging pants that belonged to Defendant. She did not know how a ski mask or ammunition had gotten in her van. The police also found a blue jump rope in the van that was similar to the green one that was used in the robbery.

. . . Lewis established that [on the night in question] she went to bed about 1:00 a.m. Defendant left the room that night to "bust a sale" or sell some marijuana. When she woke up at 7:00 a.m., Defendant had returned. She noticed a bunch of pennies on the floor and $218.00 on the counter which she had never seen before.

Officer Craig Damiani's testimony established that he is the Auburn Hills police detective involved in the investigation of the Fairfield Inn robbery. On May 21, 2003 he interviewed Defendant after he was taken into custody for assault and battery. Before he mentioned the robbery, Defendant stated "don't got me for Fairfield". Also, before there was any mention of the robbery, Defendant stated: "They have no fingerprints." "They have no face and are they going to put me in a line up to show that my body is shaped like somebody on that camera?" Defendant told him that neither a .38-caliber nor a nine-millimeter handgun was used in the robbery, and that the blue jump rope from the van was not used during the robbery. Defendant admitted that all of the men's cloth[es] in the van, except for one "red, white and grey Gear shirt, belong[ed] to him. He also admitted that the .38-caliber ammunition belonged to him. He told them that the black hooded sweatshirt with the sunburst was inside out, which explained why they did not match exactly on the video.

*People v. Jenkins*, No. 2004-198320-FC (Oakland Cnty. Cir. Ct. May 28, 2008) (unpublished).

On September 23, 2005, an Oakland County Circuit Court jury found petitioner

guilty, as charged, of armed robbery. Mich. Comp. Laws § 750.529. The trial court sentenced

3

petitioner to imprisonment for twelve to thirty years.

On appeal, petitioner challenged the weight and sufficiency of the evidence and the trial court's assessment of two offense variables of the Michigan sentencing guidelines.  In a *pro se* supplemental brief, petitioner claimed that he was deprived of effective assistance of trial counsel and that the trial court committed reversible error by allowing the prosecutor to admit hearsay testimony and extrinsic rebuttal evidence.  The Michigan Court of Appeals affirmed petitioner's conviction, but remanded the case for resentencing, because the trial court erroneously scored offense variables nine and ten of the state sentencing guidelines.  *See People v. Jenkins*, No. 266236, 2007 Mich. App. LEXIS 1126 (Mich. Ct. App. Apr. 24, 2007).  The trial court subsequently re-sentenced petitioner to imprisonment for eleven and a quarter to thirty years with credit for time served, and on November 29, 2007, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Jenkins*, 480 Mich. 953 (2007) (table).

In 2008, petitioner filed a motion for relief from judgment in which he argued that (1) the prosecution failed to prove every fact that constituted the charged offense, (2) the prosecutor's conduct resulted in a denial of due process, (3) trial and appellate counsel were ineffective, and (4) the state district court abused its discretion when it bound him over for trial without probable cause.  The trial court denied petitioner's motion after concluding that petitioner could have raised his claims on appeal and failed to demonstrate actual prejudice from the alleged irregularities.

Petitioner appealed the trial court's decision and argued in his motion to file a supplemental brief that there was systematic underrepresentation of African Americans on Oakland County juries during the years preceding his conviction. The Michigan Court of Appeals denied

4

petitioner's motion to file a supplemental brief and his application for leave to appeal.  The Court

of Appeals stated that petitioner had failed to establish entitlement to relief under Michigan Court

Rule 6.508(D).  *See People v. Jenkins*, No. 287970 (Mich. Ct. App. Mar. 2, 2009).  On October 26,

2009, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v.*

*Jenkins*, 485 Mich. 926 (2009) (table).

Petitioner filed his habeas corpus petition on January 26, 2010.[1]  The court

understands the petition to allege that:

I.      there was insufficient evidence to establish petitioner's guilt;

II.     the state district court erred when it bound petitioner over for trial
        without probable cause;

III.    the verdict was against the great weight of the evidence;

IV.     the jury could have reasonably inferred that petitioner was not
        involved in the robbery and that he was, at most an accessory after
        the fact;

V.      the desk clerk's testimony regarding the remark, "Hey, Corn, let's
        go," was inadmissible hearsay;

VI.     the trial court erred in allowing the prosecutor to present rebuttal
        evidence of Kendra and Felicia's prior inconsistent statements;

VII.    trial counsel was ineffective for failing to impeach the testimony of
        the desk clerk, failing to object to the prosecutor's questioning of a
        witness, and failing to object during the prosecutor's closing
        argument;

VIII.   appellate counsel was ineffective for failing to raise several
        meritorious and dispositive claims;

IX.     the trial court erred in scoring offense variables nine and ten;

_____

[1]  The petition is dated December 31, 2009, but was received and filed by the Clerk of
Court on January 26, 2010.

    X.      petitioner was sentenced in violation of *Blakely v. Washington*, 542 U.S. 296 (2004); and

    XI.    petitioner was denied due process and equal protection of the law where he was tried before an all-white jury and there was systematic under-representation of African Americans on Oakland County juries in the years preceding his conviction, specifically in 2005.[2]

Respondent argues in an answer to the habeas petition that petitioner did not exhaust state remedies for his eleventh claim and he procedurally defaulted his second and seventh claims by failing to raise them on direct appeal. Petitioner replies that his claims are not procedurally defaulted and that the court should either adjudicate his unexhausted eleventh claim on the merits or delete that claim rather than dismiss the entire habeas petition for failure to exhaust state remedies.          Neither exhaustion, nor procedural default, are jurisdictional limitations, *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), *cert. denied,* __ U.S. __, 130 S. Ct. 3274 (2010), and petitioner's claims lack merit. The court therefore will excuse the alleged procedural errors and proceed to adjudicate the merits of petitioner's claims.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are entitled to the writ of habeas corpus only if the state court's adjudication of their claims on the merits

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

---

    [2] The Court has adopted respondent's summary and numbering of the claims, because petitioner did not clearly enumerate the issues.

6

Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "[W]here factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct." *Goodwin v. Johnson*, 632 F.3d 301, 308 (6th Cir. 2011) (citations omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786. To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claims "was so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-787.

7

## III.  Discussion

### A.  Probable Cause in State District Court;
###      the Weight and Sufficiency of the Evidence at Trial
(Habeas claims one through four)

Petitioner alleges that, following his preliminary examination, the state district court court transferred jurisdiction to Oakland County Circuit Court without a showing of probable cause. Petitioner further alleges that the jury's verdict was against the great weight of the evidence and that there was insufficient evidence to support his conviction on an aiding and abetting theory. According to petitioner, the jury could have inferred that he was not involved in the robbery and that, at most, he was guilty of being an accessory after the fact.

The Michigan Court of Appeals concluded on review of these claims that the prosecutor presented sufficient evidence to sustain petitioner's conviction and that certain discrepancies between the hotel clerk's description of the perpetrators and petitioner's actual appearance did not preponderate so heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand.   The Court of Appeals also stated that the inconsistencies in the witnesses' testimony did not sufficiently warrant granting a new trial.

Petitioner's challenge to the probable cause determination at the preliminary examination lacks merit because he had no constitutional right to a preliminary examination. *Gerstein v. Pugh*, 420 U.S. 103, 125 n.26 (1975); *Dillard v. Bomar*, 342 F.2d 789, 790 (6th Cir. 1965).  Therefore, the prosecutor's alleged failure to present sufficient evidence of armed robbery at the preliminary examination is not a basis for habeas corpus relief.  Instead, the alleged "error raises only matters of state law and procedure and involves no federal question of fundamental fairness or constitutional protection."  *Oliphant v. Koehler*, 451 F. Supp. 1305, 1307 (W.D. Mich.

1978).

The contention that the jury's verdict was against the weight of the evidence also is a state-law argument, and a federal habeas court is allowed to review only issues of federal law. *Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (6th Cir. 2007). Thus, petitioner's weight of the evidence argument does not provide a basis for habeas corpus relief. Petitioner's sufficiency of the evidence claim, on the other hand, raises a constitutional issue. The Court finds no merit in that claim for the reasons stated below.

### 1. Clearly Established Federal Law on Sufficiency-of-the-Evidence Claims

The Supreme Court has "held that due process requires proof of each element of a criminal offense beyond a reasonable doubt." *Dretke v. Haley*, 541 U.S. 386, 395 (2004) *citing In re Winship*, 397 U.S. 358 (1970). The relevant question on habeas corpus review of a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) *citing Johnson v. Louisiana*, 406 U.S. 356, 362 (1972).

> "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.' *Cavazos v. Smith*, 565 U. S. 1, ___ (2011) (*per curiam*) (slip op., at 1). And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' *Ibid.* (quoting *Renico v. Lett*, 559 U. S. ___, ___ (2010) (slip op., at 5))."

9

*Coleman v. Johnson*, __ S. Ct. __, __, No. 11-1053, 2012 U.S. LEXIS 3943, at *1-2 (U.S. May 29, 2012) (*per curiam*).

Courts must apply the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324, n.16.  "The elements of armed robbery are: (1) an assault and (2) a felonious taking of property from the victim's presence or person (3) while the defendant is armed with a weapon."  *People v. Smith*, 478 Mich. 292, 319 (2007) *citing People v. Carines*, 460 Mich. 750, 757 (1999).  The prosecutor proceeded on an aiding and abetting theory, which required a showing that

> "(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement."

*People v. Robinson*, 475 Mich. 1, 6 (2006) *quoting People v. Moore*, 470 Mich. 56, 67-68 (2004).  "Circumstantial evidence is sufficient to sustain a conviction and the evidence need not remove every reasonable hypothesis except that of guilt."  *United States v. Clark*, 634 F.3d 874, 876 (6th Cir. 2011) *citing United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010).

## 2.  Application

There was no direct evidence linking petitioner to the crime, but the circumstantial evidence was considerable.  As explained by the Michigan Court of Appeals:

> "The prosecution presented sufficient evidence to prove that an armed robbery was committed at the hotel.  First, the prosecutor presented sufficient evidence to prove, beyond a reasonable doubt, that an assault occurred.  An assault is defined as 'an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery.'  *People v. Grant*, 211 Mich. App. 200, 202; 535 NW2d 581 (1995) (internal citation

10

and quotation marks omitted).  The evidence in this case established that the masked perpetrators entered the hotel brandishing handguns. They tied the desk clerk's hands behind his back, led him at gunpoint to the location of the money, and threatened to kill him if he did not tell them the combination to the hotel safe.  Second, the prosecutor presented uncontroverted testimony that the perpetrators removed $828.55 from the hotel in the desk clerk's presence.  Third, the desk clerk testified that all three men were armed with handguns during the robbery.  A gun is, in fact, a dangerous weapon.  *See People v. Jolly*,  442 Mich. 458, 468; 502 NW2d 177 (1993).

Furthermore, the prosecution presented sufficient evidence from which a rational jury could have concluded, beyond a reasonable doubt, that defendant committed the armed robbery or that he aided and abetted in the commission of the armed robbery.  The evidence presented at trial established that, on the night of May 17, 2003, defendant and his ex-girlfriend Kendra Lewis stayed at the Extended Stay Hotel, which was directly adjacent to the Fairfield Inn. It was defendant's idea to stay at the hotel.  He left his hotel room after midnight and returned in the early morning hours.  Some time after defendant returned to the hotel room, Kendra awoke and found a large amount of pennies on the floor and $218 in cash in the hotel room.  Although defendant claimed that Kendra gave him the cash, she told police that she did not know the source of the money.

A search of Kendra's van revealed clothing that was similar to the clothing worn by the perpetrators of the armed robbery.  Police found gloves, sweatpants, a pair of black pants with white stripes going down the sides of the legs, a pair of green plaid boxer shorts, and sweatshirts, including a sweatshirt with a sunburst design and an 'M' outlined in thread on the back.   Police also discovered ammunition for .38–caliber and nine-millimeter weapons. Police also found rolls of coins in the van that were similar to the rolls of coins taken from the hotel during the robbery, and they found a blue jump rope in the van, which was similar to the green jump rope used to tie the desk clerk's hands behind his back during the robbery.  Kendra told police that one of her daughters had a blue jump rope and that her other daughter had a multicolored green, yellow, and pink jump rope.  After the robbery, the multicolored green, yellow, and pink jump rope was missing.  Additionally, at trial, Kendra testified that defendant's nickname was 'AC,' which stood for 'Acorn.'

Kendra's sister, Felicia Lewis, testified at trial that defendant came to her house on May 21, 2003, after the incident at the

Extended Stay. He called his friend Maurice Threlkeld, a suspect in the robbery, from Felicia's home telephone.[3]  Trial testimony also revealed that, when defendant was interrogated by police, he said 'you don't got me for the Fairfield' before detectives mentioned the robbery.  During the interrogation, defendant relayed specific details about the robbery to the detectives.  He told detectives that neither a .38–caliber nor nine-millimeter handgun was used in the robbery and that the blue jump rope police recovered from Kendra's van was not used during the robbery.  Defendant admitted to the police, at one point, that all of the men's clothing in the van, except for one 'red, white and grey Gear' shirt, belonged to him.[4]  He also admitted that the .38–caliber ammunition belonged to him."

*Jenkins*, Mich. Ct. App., No. 266236, 2007 Mich App. LEXIS 1126 at *5-7 (footnotes in original).

Petitioner claims that his case is analogous to *Brown v. Palmer*, 441 F.3d 347 (6th Cir. 2006), a case in which the Sixth Circuit held that there was insufficient evidence of an armed robbery and carjacking.  The evidence in *Brown* established that the defendant in the case was merely present at the crime scene and was acquainted with the perpetrator of the crime.  The Sixth Circuit opined that the evidence pointing to Brown's guilt was "quite speculative."  *Id.* at 351.

There was more than reasonable speculation that Petitioner participated in the armed robbery or aided and abetted it.  He was absent from the room where he was staying during the early morning hours when the robbery occurred, and the hotel clerk testified that one of the perpetrators addressed an accomplice as "Corn."  Petitioner's nickname was "AC" or "Acorn."  The police found clothing, which matched the garments worn by the robbers, in petitioner's van.  Among these items police discovered a sweatshirt or jacket, which was visible on the videotape of the robbery, and petitioner initially admitted to the police that all the clothing, except one shirt, belonged to him.  The

---

[3]  Felicia denied telling the police that she overheard that conversation and that in it, defendant told Threlkheld to "get rid of the masks."

[4]  Defendant later denied that the sweatshirt with the sunburst design belonged to him.

police also found gloves, a rope similar to the one used in the robbery, and rolls of coins in the van. Cash and coins were found in petitioner's hotel room after the robbery, and, when the police interviewed petitioner, he appeared to know details about the robbery before the police mentioned the robbery to him.

Petitioner contends that the jury could have inferred from the evidence that he was not involved in the robbery and was, at most, merely an accessory after the fact. The prosecutor, however, did not have an affirmative duty "to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 326. Furthermore, "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Johnson*, 2012 U.S. LEXIS 3943, at *8 *quoting Jackson*, 443 U.S. at 319. The jury could have reasonably concluded that petitioner was more than an accessory after the fact and that he actively participated in the armed robbery. At a minimum, the jury could have inferred from the circumstantial evidence that petitioner aided and abetted the robbery by providing the perpetrators with a gun, approaching the hotel clerk with the other men, and supplying the rope that was used to restrain the clerk.

After construing the aforementioned evidence, in a light most favorable to the prosecution, a rational juror could have concluded that petitioner was guilty of armed robbery, either as a principal or as an aider and abettor. Therefore, the state court's decision that the prosecutor presented sufficient evidence to sustain petitioner's conviction was not contrary to, or an unreasonable application of *Jackson*, and petitioner's challenge to the sufficiency of the evidence is without merit.

## B. The Evidentiary Issues
(Habeas claims five and six)

13

### 1.  The Desk Clerk's Testimony

As already noted, petitioner's nickname was Acorn or AC, and the hotel desk clerk, Llanard Hanley, testified that one of the perpetrators said, "Hey, Corn, let's go." Petitioner contends that Hanley's remark was inherently incredible and inadmissible hearsay.

The Michigan Court of Appeals determined that the challenged remark did not qualify as hearsay because it was a command, not an assertion. The Court of Appeals also stated that the remark was admissible under the court rule permitting courts to admit co-conspirators' statements. *See* Mich. R. Evid. 801(d)(2)(E) (explaining that "[a] statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy").

"What is or is not hearsay evidence in a state court trial is governed by state law." *Johnson v. Renico*, 314 F. Supp. 2d 700, 705 (E.D. Mich. 2004) (citations omitted). Consequently, this court must defer to the state appellate court's ruling that Hanley's testimony about the contested remark was not hearsay and was admissible at trial. "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citations omitted). Thus, petitioner has no right to habeas relief on the basis of his hearsay claim.

### 2.  The Rebuttal Evidence

Petitioner further alleges that the trial court erred when it permitted the prosecutor to elicit testimony from Detective Scott Edwards that the trial testimony of Kendra and Felicia Lewis conflicted with their prior statements to the police. Detective Edwards testified that, during his interview with Kendra, she acted surprised when he showed her the blue jump rope that the police

14

found in her van.  She explained to Edwards that her mother had purchased blue, green and yellow jump ropes for her children and that the blue one belonged to one of the children.  Kendra stated that she could not find the green and yellow ropes and that she last saw the blue rope at the house.  She noted that the rope's handles were missing.  (Tr. Sept. 22, 2005, at 259-60.)

Kendra also informed Detective Edwards that petitioner had returned to their hotel room about 5:30 a.m. on May 18, 2003, and that she later observed about 100 pennies on the floor of the hotel room.   Kendra subsequently told Detective Edwards that petitioner had returned to the room between 4:00 and 5:30 a.m.  (*Id.* at 259-63.)

At trial, Kendra denied telling Detective Edwards that petitioner had returned to their room about 5:30 a.m., claiming instead that she did not know when petitioner returned to the room.  She also denied telling Detective Edwards that there were a hundred pennies on the floor of the room.  Instead, Kendra insisted that there were a couple of pennies on the floor of their room.  (Tr. Sept. 21, 2005, at 90-91, 97-98.)  She further testified that she had packed the jump ropes, including the blue one, in the van, and claimed that she did not recall whether the handles were detached from the blue rope at that time.  (*Id.* at 111, 115.)

Detective Edwards testified that Felicia also made prior inconsistent statements.  In Felicia's interview with Detective Edwards, she stated that petitioner's cell phone had been ringing incessantly on May 21, 2003, and that he refused to answer it even though he knew that Maurice Threkeld, another suspect in the case, was trying to reach him.  Felicia also informed Detective Edwards that petitioner had asked to use her home telephone to call Maurice, and, during his conversation with Maurice, petitioner instructed Maurice to get rid of the masks and clothing in his car.  (Tr. Sept. 22, 2005, at 263-64.)  At trial, Felicia denied that she heard what petitioner had said

15

to Maurice.  She also denied telling Detective Edwards that she overheard petitioner instructing the person on the other end of the phone to get rid of the masks and clothing in the car.  (*Id*. at 66, 69.)

Petitioner contends that Detective Edwards' testimony about Kendra and Felicia's prior inconsistent statements was improper extrinsic evidence, which should not have been used to impeach witnesses on collateral matters.  Nevertheless, on petitioner's direct appeal, the Michigan Court of Appeals stated that extrinsic evidence may be used to impeach a witness on a material or related matter.  *See Jenkins*, 2007 Mich. App. LEXIS 1126 at *15 *citing* Mich. R. Evid. 613(b).  The Court of Appeals concluded that the matters in question in petitioner's case were not collateral matters and that the trial court did not abuse its discretion by allowing Detective Edwards' testimony to be admitted to rebut Kendra and Felicia's testimony.

This Court agrees with the state court's finding that Detective Edwards' testimony did not pertain to mere collateral matters and that the evidence was relevant to the determination of petitioner's guilt.  The state court's determination that the testimony was admissible under state law is binding on this court.  *Bradshaw*, 546 U.S. at 76.  Furthermore, since Detective Edwards' testimony was not fundamentally unfair, it did not violate petitioner's right to due process.  *Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citations omitted); *see McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004).

**C. Ineffective Trial and Appellate Counsel**
(Habeas claims seven and eight)

Petitioner complains that his trial attorney was unprepared for trial, failed to impeach a witness and did not make certain important objections.  The Michigan Court of Appeals concluded that petitioner failed to overcome the heavy burden of proving that he received ineffective assistance of counsel.

16

### 1.  Trial Counsel

The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984), constitutes clearly established federal law for purposes of evaluating a claim of ineffective assistance of counsel.  *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1403 (2011).  Pursuant to *Strickland*, petitioner must demonstrate that his attorney's "performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687.

The "deficient performance" prong requires a showing that petitioner's counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

To establish that counsel's performance prejudiced the defense, petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome.'" However, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 *quoting Strickland*, 466 U.S. at 693.  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788 (citations omitted).

### a.  The Failure to Impeach the Hotel Clerk with Police Reports

Petitioner asserts that trial counsel should have attempted to attack Llanard Hanley's credibility after Hanley testified that one of the perpetrators said, "Hey, Corn, let's go."  Petitioner faults trial counsel for not impeaching Hanley with police reports, which show that Hanley did not inform the police that one of the perpetrators said, "Hey, Corn, let's go."

The absence of the comment in police reports does not prove that the comment was never made, and even if trial counsel had raised the issue, Hanley might have explained his failure to mention the comment by stating that he was excited or upset at the time or that he simply forgot to mention all the details of the incident.

Trial counsel did elicit testimony from Hanley that the three perpetrators were not identifiable in any fashion, that he could not determine the race of two of the men, and that he could not say whether petitioner was one of the perpetrators.   (Tr. Sept. 20, 2005, at 168, 174-75, 177.) Trial counsel was not ineffective because he failed to elicit additional testimony that Hanley did not tell the police about the perpetrator's comment, "Hey, Corn, let's go."   Even if counsel's performance was deficient, such performance did not prejudice petitioner given the strength of the other circumstantial evidence against him.

### b.  The Failure to Object to the Prosecutor's Conduct

Petitioner claims that trial counsel should have objected when the prosecutor attempted to impeach his own witness.  This claim arose when the prosecutor asked Kendra Lewis whether Petitioner told her two days before trial to change her story about a physical confrontation she had with petitioner after the robbery.   Kendra denied that petitioner asked to change her testimony.   She also denied talking to petitioner about his case while the two of them were seated next to each other in the courtroom hallway.  (Tr. Sept. 21, 2005, at 119-20.)  Petitioner claims that there was no evidence to support the prosecutor's questions and that such inquiry amounted to testimony by the prosecutor.

Under Michigan law, a party may impeach, cross-examine or attack the credibility of any witness, including the party's own witness.  Mich. Comp. Laws § 767.40a(6); Mich. R. Evid.

18

607. Thus, the prosecutor's questions were not improper and petitioner's claim does not rise to the level of a constitutional violation meriting habeas corpus relief. *Lyle v. Koehler*, 720 F.2d 426, 429 (6th Cir. 1983). Furthermore, trial counsel did object on the ground that the prosecutor's questions were leading and the trial court sustained the objection. (Tr. Sept. 21, 2005, at 120-21.) Consequently, petitioner's claim lacks merit.

### c. Failure to Object to the Prosecutor's Closing Argument

Petitioner claims that trial counsel should have objected to the prosecutor's closing argument that petitioner did not have a good alibi. (Tr. Sept. 23, 2005, at 12.) Petitioner contends that this remark shifted the burden of proof to him to prove his innocence.

A prosecutor may not shift the burden of proof to the defendant, *Patterson v. New York*, 432 U.S. 197, 215 (1977), or suggest that the defendant had an obligation to produce evidence to prove his innocence. *United States v. Clark*, 982 F.2d 965, 968-969 (6th Cir. 1993). But prosecutors may comment on a defendant's failure to call an available alibi witness, *United States v. Schultz*, 698 F.2d 365, 367 (8th Cir. 1983), or to produce witnesses to contradict the government's case "so long as the prosecutor does not suggest that the defendant bears the burden of proof." *Perkins v. McKee*, 411 F. App'x 822, 832 (6th Cir. 2011).

The prosecutor at petitioner's trial did not suggest that petitioner carried the burden of proving his innocence. In fact, the prosecutor stated that it was his own burden to prove his case beyond a reasonable doubt. (Tr. Sept. 23, 2005, at 36.) The trial court, moreover, instructed the jurors that petitioner was presumed innocent and did not have to prove his innocence by presenting his own case and that the attorneys' statements and arguments were not evidence. (*Id*. at 39-41.) The Court concludes that the prosecutor's comment was proper and, even if it were improper, it was

19

not flagrant misconduct.  Consequently, trial counsel's failure to object did not amount to deficient performance.

### d.  The Alleged Failure to Prepare for Trial

Petitioner alleges that his trial attorney met with him for only ten minutes before trial and failed to investigate or prepare for trial.  The attorney who represented petitioner at trial was not petitioner's first attorney, and by the time he was appointed, a number of motions had already been filed and decided.

Even assuming that trial counsel spent only a short amount of time with petitioner before trial, the record indicates that he was thoroughly prepared and did his utmost to represent petitioner.  The trial court stated at the sentencing that petitioner could not have gotten better representation.  The trial court noted that counsel presented a vigorous defense, effectively challenged the prosecutor's proof and put forward a strategy that was one of the finest the court had seen.  (Tr. Oct. 7, 2005, at 22-23.)

The Michigan Court of Appeals stated that "defense counsel was proficient and well-prepared and that he was a zealous advocate for [petitioner] throughout the proceedings." *Jenkins*, 2007 Mich. App. LEXIS 1126 at *18.  The record supports the state courts' assessment of trial counsel. Trial counsel made an opening statement, effectively cross-examined witnesses, made objections, which the trial court frequently sustained, requested a jury instruction on accessory after the fact and made a closing argument in which he maintained that there was no direct evidence against petitioner.  Petitioner has not alleged a defense that he would have asserted if he had been consulted before trial and he has failed to demonstrate that the result of his trial would have been different had his attorney done more.  Thus, trial counsel's allegedly deficient performance did not

prejudice petitioner.

## 2. Appellate Counsel

Petitioner alleges that his appellate attorney was ineffective for failing to raise his trial counsel's ineffectiveness on appeal. The *Strickland* test for ineffective assistance of trial counsel (deficient performance and prejudice) applies to claims about appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). To prove the deficient performance prong of *Strickland*, petitioner must show that his appellate attorney was objectively unreasonable in failing to raise nonfrivolous issues on appeal. *Id.* To satisfy the prejudice prong, petitioner must demonstrate a reasonable probability that he would have prevailed on appeal were it not for his attorney's alleged errors. *Id.*

> "Failure of appellate counsel to raise an issue on appeal can amount to constitutionally ineffective assistance. *McFarland* [*v. Yukins*, 356 F.3d 688, 710 (6th Cir. 2004)]. Yet, counsel has no obligation to raise every possible claim and "the decision of which among the possible claims to pursue is ordinarily entrusted to counsel's professional judgment." *Id.* An appellate attorney is not required to raise a non-meritorious claim. *See Wilson v. Mitchell*, 498 F.3d 491, 514–15 (6th Cir. 2007)."

*Jalowiec v. Bradshaw*, 657 F.3d 293, 321-322 (6th Cir. 2011). Moreover, "appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

As already noted, trial counsel was not ineffective because trial counsel's representation did not fall below an objective standard of reasonableness. Thus, appellate counsel cannot be held accountable for failing to raise petitioner's claims concerning trial counsel's ineffectiveness.

## D. The Sentence
(Habeas claims nine and ten)

Petitioner asserts that the trial court erred when it scored ten points for offense variable nine (number of victims) and fifteen points for offense variable ten (predatory conduct) of the Michigan sentencing guidelines. Petitioner claims that the trial court's assessments were not supported by the record and contravened his Sixth Amendment right to a jury trial as set forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004).

Petitioner's claim "that the trial court erred in applying the state sentencing guidelines raises an issue of state law only. It does not implicate any federal rights," *Garcia-Dorantes v. Warren*, 769 F. Supp.2d 1092, 1112 (E.D. Mich. 2011), and "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Therefore, a claim that the trial court incorrectly calculated the state sentencing guidelines is not cognizable on federal habeas corpus review. *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007); *McPhail v. Renico*, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006); *Robinson v. Stegall*, 157 F. Supp. 2d 802, 823 (E.D. Mich. 2001).

Petitioner attempts to couch his claim in constitutional terms by alleging that he was sentenced on the basis of inaccurate information. The Michigan Court of Appeals, however, agreed with petitioner that he should not have received any points for offense variables nine and ten. The Court of Appeals remanded the case for re-sentencing within a sentencing guidelines range of 81 to 135 months. On remand, the trial court assessed no points for offense variables nine and ten and sentenced petitioner to a minimum sentence within the guidelines range of 81 to 135 months. As a result, the alleged inaccuracies were cured at re-sentencing.

Petitioner's *Apprendi/Blakely* claim must also fail. In *Apprendi*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime

beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.  In *Blakely*, the Supreme Court stated "that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303.

Unlike the determinate sentencing scheme at issue in *Blakely*, Michigan has an indeterminate sentencing scheme in which "[t]he maximum penalty is set by statute, but the minimum penalty is determined by the sentencing court and must fall within a mandated guidelines range." *Montes v. Trombley*, 599 F.3d 490, 496 (6th Cir. 2010).  "*Apprendi*'s rule does not apply to judicial factfinding that increases a minimum sentence so long as the sentence does not exceed the applicable statutory maximum." *Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (citation omitted).  Petitioner's sentence of twelve to thirty years did not exceed the statutory maximum penalty of life imprisonment or any term of years.  *See* Mich. Comp. Laws § 750.529. Therefore, petitioner's *Blakely* claim is without merit.

### E.  The Jury Venire
(Habeas claim eleven)

Petitioner's final claim alleges that he was denied due process and equal protection of the law because he was tried before an all-white jury and there was systematic under-representation of African-Americans on Oakland County juries in 2005 when he was tried.  "The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, __ U.S. __, __, 130 S. Ct. 1382, 1387 (2010) *citing Taylor v. Louisiana*,  419 U.S. 522 (1975).  To establish a *prima facie* violation of the Sixth Amendment's fair-cross-section requirement, a defendant must show:

23

"(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id*. at 1388 *quoting Duren v. Missouri*, 439 U.S. 357, 364 (1979).

As an African American, petitioner belongs to a distinctive group in the community. *United States v. Forest*, 355 F.3d 942, 953 (6th Cir. 2004) (citations omitted). Therefore, he has satisfied the first prong of the *Duren* test for a violation of the Sixth Amendment's fair-cross-section requirement. Petitioner has not, however, submitted any evidence demonstrating that the number of African Americans in Oakland County jury venires was unfair and unreasonable in relation to the number of African Americans in the community. Nor has he shown that any underrepresentation was due to systematic exclusion of African Americans in the jury-selection process. It is not enough to "point[] to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Berghuis*, 130 S. Ct. at 1395 (emphasis in original). Accordingly, petitioner's underrepresentation claim is unavailing.

## IV.  CONCLUSION

The state court decisions rejecting petitioner's claims were not contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent or based on unreasonable determinations of fact. Consequently, the petition for writ of habeas corpus is **DENIED**.

## V.  CERTIFICATE OF APPEALABILITY

A prisoner seeking postconviction relief under 28 U.S.C. § 2254 must seek and obtain a certificate of appealability before appealing a district court's denial or dismissal of a habeas

24

petition. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).   A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When, as here, the district court "rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:   The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Some of petitioner's claims are not cognizable on habeas corpus review and others challenge the trial court's evidentiary rulings, which are entitled to deference.   Moreover, petitioner's remaining claims are entitled to double deference. Thus, reasonable jurists would not debate the court's assessment of petitioner's claims, and the court, therefore, declines to issue a certificate of appealability.  Petitioner may, nevertheless, proceed *in forma pauperis* if he chooses to appeal this decision because he was granted *in forma pauperis* relief in the District Court and he could file an appeal in good faith.  FED. R. APP. P. 24(a)(3)(A).

Accordingly, for the reasons stated herein,

IT IS ORDERED that the Petition for Writ of Habeas Corpus is denied.

IT IS FURTHER ORDERED that a certificate of appealability is denied.

IT IS FURTHER ORDERED that leave to appeal in forma pauperis is granted.

Dated: July 5, 2012                              s/Bernard A. Friedman
                                                 BERNARD A. FRIEDMAN
                                                 SENIOR UNITED STATES DISTRICT JUDGE